**Jessica L. HAYDEN, Nicole C. Merrill and Colleen M. Rhoads, Plaintiffs, Appellants,**

**v.**

**Richard GRAYSON, Chief of Police of the Town of Lisbon, et al., Defendants, Appellees.**

**No. 97–1623.**

United States Court of Appeals, First Circuit.

Heard Oct. 8, 1997.

Decided Jan. 22, 1998.

---

Edward M. Van Dorn, Jr., with whom Brad W. Wilder and Van Dorn & Cullenberg, Orford, NH, were on brief for appellants.

John T. Alexander, with whom Michael Lenehan and Ransmeier & Spellman P.C., Concord, NH, were on brief for appellees.

Before BOUDIN, Circuit Judge, GODBOLD* and CYR, Senior Circuit Judges.

CYR, Senior Circuit Judge.

Plaintiffs appeal from a district court judgment dismissing their equal protection claims against the Town of Lisbon, New Hampshire, and its chief of police, Richard Grayson, for failing to investigate allegations that their father abused them sexually while they were minors. We affirm.

# I

## BACKGROUND

Although the three sisters first lodged these allegations in 1983, Grayson took no action other than to misrepresent that the district attorney had declined to prosecute. Seven years later, after attaining their majority, plaintiffs discovered Grayson's misrepresentation and took their allegations to the district attorney. Their father presently is serving a lengthy prison sentence, following his conviction for aggravated sexual assault.

Plaintiffs filed the instant action against the Town and Grayson, in his individual and official capacities, claiming inter alia that Grayson refrained from investigating their allegations either because plaintiffs were female, children, or victims of domestic sexual abuse, and that such selective law enforcement violated their individual rights under the Equal Protection Clause. See U.S. Const. amend XIV; 42 U.S.C. § 1983.[1] In

due course, the equal protection count against the Town was dismissed for failure to state a claim. See Fed.R.Civ.P. 12(b)(6). Following discovery, defendant Grayson was awarded summary judgment on the individual-capacity claim because plaintiffs had failed to adduce sufficient evidence that he intended to discriminate due to their membership in any of the three classes alleged in their complaint. The district court thereafter denied plaintiffs' postjudgment motion for reconsideration. See Fed.R.Civ.P. 59.

# II

## DISCUSSION

A. The Equal Protection Claim Against Grayson[2]

■ The Fourteenth Amendment mandates that no State "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV. Thus, although there is no constitutional right to police protection, State executive and law enforcement officials may not "selectively deny ... protective services to certain disfavored minorities." DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 197 n. 3, 109 S.Ct. 998, 1004 n. 3, 103 L.Ed.2d 249 (1989).

■ Plaintiffs rely on City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), for their contention that the district court should not have applied the equal protection test governing race and gender classifications, which necessitated that plaintiffs show that Grayson acted with discriminatory intent. Instead, plaintiffs argue, in cases involving less invidious but nonetheless arbitrary classifications, such as child victims of domestic sexual abuse, Cleburne simply envisions that plaintiffs prove that the defendant's decision

---

* Of the Eleventh Circuit, sitting by designation.

1. It is undisputed that Grayson at all times acted under color of state law. See 42 U.S.C. § 1983.

2. After examining all competent evidence in the light most favorable to the party opposing summary judgment, we are required to make a de novo determination as to whether a trialworthy issue remained or the moving party was entitled to judgment as a matter of law. See Dominique v. Weld, 73 F.3d 1156, 1158 (1st Cir.1996).

lacked a "rational basis," without regard to any discriminatory intent.[3]

Plaintiffs misconstrue the *Cleburne* decision. There the Supreme Court expressly noted the finding made by the district court that the municipality's principal reason for denying the requested zoning permit had been "that the residents of the [plaintiff] home would be persons who are mentally retarded," *id.* at 437, 105 S.Ct. at 3253, a finding which was never challenged on appeal. Thus, it was only because the city's discriminatory motive had been established *ab initio* that the Court addressed whether the city need demonstrate a "compelling" or "important" state interest—criteria theretofore reserved for race and gender discrimination—or need simply articulate a "rational basis" for its decision. *Id.* at 440–41, 105 S.Ct. at 3254–55. Accordingly, *Cleburne* did not hold that no threshold proof of intent to discriminate is required in cases involving less invidious arbitrary classifications.[4]

■ The motivation underlying a municipal decision is not always so apparent as in *Cleburne*, of course, especially if the challenged decision does not expressly single out a particular class of persons for disadvantageous treatment. Even in such instances, however, members of the plaintiff class quite understandably may consider it no mere coincidence that a facially neutral decision causes a disproportionately unfavorable impact on their particular class. Nevertheless, even evidence of a widely disproportionate impact on the plaintiff class normally is not enough, standing alone, to establish an equal protection violation. *See, e.g., Personnel Adm'r of Mass. v. Feeney,* 442 U.S. 256, 274–

75, 99 S.Ct. 2282, 2293–94, 60 L.Ed.2d 870 (1979) (upholding veteran's preference in civil service hiring, although vast majority of veterans hired were male). Rather, plaintiffs must adduce competent evidence of "purposeful discrimination." *Washington v. Davis,* 426 U.S. 229, 243–44, 96 S.Ct. 2040, 2049–50, 48 L.Ed.2d 597 (1976); *Soto v. Flores,* 103 F.3d 1056, 1067 (1st Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 71, 139 L.Ed.2d 32 (1997).

■ The burden is an onerous one: " 'Discriminatory purpose' ... implies that the decisionmaker ... selected or reaffirmed a course of action at least in part *'because of,'* not merely 'in spite of,' its adverse effects upon an identifiable group." *Feeney,* 442 U.S. at 279, 99 S.Ct. at 2296 (emphasis added; citation omitted); *Soto,* 103 F.3d at 1067. Thus, unless these plaintiffs established the requisite discriminatory intent, their equal protection claim cannot succeed even assuming the Grayson decision not to investigate lacked a "rational basis." *See Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977); *Semple v. City of Moundsville,* 963 F.Supp. 1416, 1433 (N.D.W.Va.1997).

■ Plaintiffs claim that the district court disregarded competent evidence that Grayson harbored "archaic stereotypes" regarding female-child sexual abuse in the home and singled out its victims for unfavorable treatment in determining whether to investigate. The record does not support their contention, however.[5]

---

**3.** The Equal Protection Clause safeguards not merely against such invidious classifications as race, gender and religion, but any arbitrary classification of persons for unfavorable governmental treatment. *Cf. Wayte v. United States,* 470 U.S. 598, 608, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547 (1985) (noting, in relation to selective prosecution cases, that "the decision to prosecute may not be 'deliberately based upon an unjustifiable standard such as race, religion, or *other arbitrary classification* ' ") (emphasis added; citations and internal quotation marks omitted).

**4.** The other case relied upon by plaintiffs in this regard is to the same effect. *See Navarro v. Block,* 72 F.3d 712, 715–16 (9th Cir.1996) (vacating summary judgment for County on equal pro-

tection claim because there existed a trialworthy issue as to whether County policy according different treatment to domestic and nondomestic violence had a "rational basis," but only *after* the County had conceded, *arguendo* on appeal, "that it had a policy of affording victims of domestic violence less police protection").

**5.** Plaintiffs adduced no evidence that Grayson's reluctance to pursue criminal investigations was based on their gender. On the contrary, plaintiffs proffered evidence that Grayson failed to investigate a 1990 allegation that a 12–year–old boy had been sexually molested by his grandfather. Nor did plaintiffs adduce statistical or other evidence relating to whether females comprise

At no time did Grayson indicate to anyone that he would not investigate allegations of child sexual abuse in the home because he thought the victims were undeserving of equal law-enforcement protection. Instead, he explained to a fellow officer that he had refrained from investigating plaintiffs' allegations at their mother's request.[6] Another police officer confirmed that it was Grayson's policy not to intervene where a family member (*e.g.*, nonabusive parent or spouse) requested that there be no investigation.

■ Plaintiffs essentially claim, nonetheless, that their evidence supported, respectively, rational inferences that Grayson intended to treat all domestic crime differently from nondomestic crime, all crimes against children differently from crimes against adults, and all sexual abuse crimes differently from nonsexual crimes.[7] Once again the evidence does not bear out their claim.

Plaintiffs' proffer disclosed that the nonintervention policy attributed to Grayson may have been much broader than plaintiffs allow, in that it applied not merely to domestic child sexual abuse, but to other crimes in circumstances where general concerns for family integrity and family privacy predominated.[8] Thus, their proffer may be seen to belie their contention that Grayson sought to discriminate against them *because of,* rather than *in spite of,* their status as victims of child sexual abuse in the home. *See Feeney,* 442 U.S. at 279, 99 S.Ct. at 2296. Far from demonstrating general condonation of child sexual abuse in the home, therefore, the proffer simply supported a reasonable inference that Grayson would investigate virtually *any allegation of crime absent* an appropriate request from a nonoffending spouse to refrain from intervention in circumstances where legitimate, competing family interests were thought to predominate. Accordingly, although the evidence may well have demonstrated that the Grayson nonintervention policy had a disproportionate adverse impact in cases involving allegations relating to the various victim classes in which plaintiffs claimed membership, it did not demonstrate that Grayson harbored a discriminatory animus toward those victim classes. *Id.* at 274, 99 S.Ct. at 2293–94 (upholding veteran's preference in civil service hiring, even though vast majority of veteran hirees were male).

Similarly, plaintiffs presented evidence that Grayson, on two other occasions, failed to investigate allegations of child sexual abuse in the home. Once again, however, there was no evidence that Grayson was motivated by a discriminatory animus, as distinguished from a neutral nonintervention policy. Moreover, Grayson proffered undisputed evidence that he had investigated at least two other domestic child sexual abuse cases, as well as eight nondomestic child

---

a majority of (1) sexual abuse victims; (2) domestic sexual abuse victims; (3) sexually abused minors; or (4) minors sexually abused in the home. Furthermore, Officer Boutin attested that though Grayson often did not pursue allegations of crimes committed against children if a nonoffending adult family member urged him not to do so, this "policy" did not depend on whether the victims were male or female. *See infra* note 8. Given its serious deficiencies, the gender classification claim quite properly was rejected by the district court.

6. Specifically, the mother told Grayson that "she did not want the girls involved in a prosecution." Plaintiffs have not contested this evidence.

7. The district court reserved the question whether the evidence relating to Grayson's own statements would be admissible. *See* Fed.R.Evid. 801(d)(2) (admission by party-opponent).

8. In the portion of Officer Boutin's deposition proffered below, the inquiry is ambiguously phrased by plaintiffs in terms of how Grayson acted "in these kinds of cases" compared to "other [ ] more conventional kinds of crimes," without particularizing any *characteristic* of these alleged crimes which was unconventional in their view (*e.g.*, domestic, sexual abuse, or crimes against children or female victims), or which triggered the Grayson nonintervention policy. Perhaps for this very reason, then, Officer Boutin ambiguously responded that the police "took into [account] what the *mother* had to say *or* the *victim*'s rights were, I mean, emotions were," and "if the *family*'s wishes were that it didn't get prosecuted, then it didn't." Although Boutin allowed that the Grayson nonintervention policy would apply to crimes against children, at no time did he state that it applied exclusively to such crimes. These unaddressed ambiguities plainly invited a rational inference that the challenged nonintervention policy was predicated on a generalized concern for family integrity and privacy, which would be activated, for example, at the instance of a nonoffending spouse even though the allegations may have related to nonsexual criminal activity directed against an adult family member.

sexual abuse cases. *Cf. Willhauck v. Halpin,* 953 F.2d 689, 712 (1st Cir.1991) (in analogous context of equal protection claim founded on selective prosecution, "[i]t must be shown that others similarly situated have not been prosecuted and that the decision to prosecute has been motivated by an impermissible reason").

■ Finally, in an ironic twist, the discriminatory focus essential to plaintiffs' equal protection claims was irredeemably blurred by their proffer that the Grayson nonintervention policy extended well beyond domestic child sexual abuse cases (*e.g.,* to DWI and vandalism), and may even have been due to Grayson's dishonesty, chronic lassitude, alcohol abuse, or desire to wage personal vendettas against particular individuals rather than groups. *See New Burnham Prairie Homes, Inc. v. Village of Burnham,* 910 F.2d 1474, 1481 (7th Cir.1990) (noting that "[d]iscrimination based merely on individual, rather than group, reasons will not suffice" to establish equal protection violation). That is to say, although their scattershot approach might enable a rational inference that Grayson was a poor police chief, it cannot sustain a non-speculative inference that he failed to investigate these allegations *because* plaintiffs were children who had been sexually abused, or *because* plaintiffs had been sexually abused in the home. *See Soto,* 103 F.3d at 1072 ("Whether this deplorable scenario is actionable under Puerto Rican law we leave, as we must, to others.").[9]

B. *The Equal Protection Claim Against the Municipality*

■ The district court dismissed the equal protection count against the Town for failure to state a claim. *See* Fed.R.Civ.P. 12(b)(6). Eighteen months later, plaintiffs moved to reinstate and amend the claim, *see* Fed.R.Civ.P. 15, to allege that the Town should be held liable either because Grayson was the municipal official who instituted the official "policy" against providing law-enforcement protection to child victims of sexual abuse in the home, *see Monell v. Department of Social Servs. of New York,* 436 U.S. 658, 694–95, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978), or because the Town failed to train Grayson adequately to deal with domestic child sexual abuse, which constituted "much" or "most" of the crime in the community.

■ The district court denied the motion to amend, on the ground that its earlier Rule 12(b)(6) dismissal amounted to a decision "on the merits" and, accordingly, the law of the case.[10] Even assuming the rationale for the instant decision were to be found infirm, *see Griggs v. Hinds Junior College,* 563 F.2d 179, 180 (5th Cir.1977) (noting that Rule 15 amendment is "especially appropriate [ ] . . . when the trial court has dismissed the complaint for failure to state a claim"); *see also Dussouy v. Gulf Coast Inv. Corp.,* 660 F.2d 594, 598 n. 2 (5th Cir.1981), we would affirm on the ground that the proposed amendment would have been futile. *See Levy v. FDIC,* 7 F.3d 1054, 1056 (1st Cir.1993).

■ Rule 15 permits the trial court to deny leave to file an amended complaint which would be subject to immediate dismissal under Rule 12(b)(6) for failure to state a

---

**9.** The district court denied plaintiffs' post-judgment motion for reconsideration, *see* Fed. R.Civ.P. 59, because their "new" evidence of discriminatory intent had been available at summary judgment. Plaintiffs respond that Grayson's motion for summary judgment failed to put them on adequate notice that he disputed their allegations of discriminatory intent. We review the Rule 59 decision only for manifest abuse of discretion. *See Vasapolli v. Rostoff,* 39 F.3d 27, 36 (1st Cir.1994).

The Grayson motion could not have been more explicit: "Defendant Grayson denies any intent to discriminate against the plaintiffs on any basis." Further, "[t]he plaintiffs have produced no evidence suggesting that defendant Grayson

wanted to harm them because they were women, or because they were minors, or because they were alleged victims of sexual assaults." True, plaintiffs' default may flow from their misreading of *Cleburne. See supra* pp. 452–53. Nevertheless, "[Rule 59] does not provide a vehicle for a party to undo its own procedural failures, and it certainly does not allow a party to introduce new evidence or advance arguments that could and should have been presented to the district court prior to the judgment." *Aybar v. Crispin–Reyes,* 118 F.3d 10, 16 (1st Cir.1997).

**10.** We review the Rule 15 decision for abuse of discretion. *RTC v. Gold,* 30 F.3d 251, 253 (1st Cir.1994).

viable claim for relief. *See Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *Mills v. State of Me.*, 118 F.3d 37, 55 (1st Cir.1997). The Town cannot be held vicariously liable in an action under section 1983 unless its official policy or custom was the "moving force" behind the alleged violation of constitutional rights. *See Monell*, 436 U.S. at 694, 98 S.Ct. at 2037–38.[11] Normally, therefore, a municipality cannot be held liable unless its agent actually violated the victim's constitutional rights. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1986) ("If a person has suffered no constitutional injury at the hands of [any] individual police officer, the fact that the departmental regulations might have authorized [unconstitutional action] is quite beside the point.").

Plaintiffs simply allege that the Town is liable under section 1983 because Grayson established an official Town policy or custom of selective law enforcement which in turn caused them injury.[12] Since their predicate claim against Grayson fails, however, *see supra* Section II.A, so must their contention that any such discriminatory Town policy or custom existed.

■ Alternatively, of course, the Town could be held liable under section 1983 were it to appear that the injury to plaintiffs was caused by the Town's *failure to train* Grayson. The liability criteria for "failure to train" claims are exceptionally stringent, however. *See City of Canton v. Harris*, 489 U.S. 378, 388–89, 391, 109 S.Ct. 1197, 1204–05, 103 L.Ed.2d 412 (1989).

■ Only if the failure to train "amounts to *deliberate indifference* to the rights of persons with whom the police come into contact," and is "closely related" to, or "the moving force" behind, the constitutional injury, can the claim against the municipality prevail. *Id.* (emphasis added). For this "deliberate or conscious choice" to have been established, plaintiffs needed to present evidence that (1) the Town knew when it hired Grayson that the risk of future equal protection violations arising and recurring in domestic child sexual abuse cases was "so obvious" that its failure to train him therein likely would result in continued violations; *or* (2) even though the initial risk of recurring constitutional violations was not "so obvious," the Town subsequently learned of a serious recurrence, yet took no action to provide the necessary training. *Id.* at 390 & n. 10, 109 S.Ct. at 1205 & n. 10; *see also id.* at 396, 109 S.Ct. at 1208–09 (O'Connor, J., concurring in part).[13]

To begin with, plaintiffs merely allege that "Lisbon *is* a high crime area in northern Grafton County [and] that much or most of the crime committed in northern Grafton County *involves* domestic violence and sexual abuse." (Emphasis added.) There is no al-

11. Municipal customs, for § 1983 purposes, are "such practices of state officials ... [as are] so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Id.* at 691, 98 S.Ct. at 2036.

12. We assume *arguendo* that Grayson, as police chief, was a Town policymaker with respect to law enforcement.

13. We have considerable doubt whether the failure-to-train claim survived either the dismissal of the § 1983 claim against Grayson, individually, *see supra* Section II.A, or the *Monell* policy-based claims against the Town and Grayson, in his official capacity, *supra*. If Grayson never violated plaintiffs' constitutional rights in the first instance, it is difficult to see how a failure to train him could have *caused* any "constitutional injury" to plaintiffs. *Compare Evans v. Avery*, 100 F.3d 1033, 1040 (1st Cir.1996) (affirming dismissal of § 1983 substantive-due-process claim against City where its agents were found not to have violated plaintiff's constitutional rights) (citing *Heller*, 475 U.S. at 799, 106 S.Ct. at 1573),

*with Simmons v. City of Philadelphia*, 947 F.2d 1042, 1063 (3d Cir.1991) (holding that city policymakers, who owed an independent duty to pretrial detainees, were individually liable under § 1983 for prisoner suicide, even though factfinder determined that the turnkey had not violated prisoner's constitutional rights); *de Feliciano v. de Jesus*, 873 F.2d 447, 450 (1st Cir.1989) ("There may well be a basis for an agency's liability other than the conduct of the individual defendants that the jury exonerated."). *See generally* Barbara Kritchevsky, *Making Sense of State of Mind: Determining Liability in Section 1983 Municipal Liability Litigation*, 60 Geo. Wash. L.Rev. 417, 445–73 (1992) (summarizing conflicting case law). Nevertheless, assuming *arguendo* that dismissal of the individual-capacity claim against Grayson would not necessitate dismissal of the failure-to-train claim against the Town, the proffered amendment would still be futile due to the stringent definition of "deliberate indifference" prescribed in *City of Canton*.

legation that these circumstances obtained in 1975, however, when Grayson became the police chief. No less importantly, even assuming similar circumstances prevailed in 1975, the need to train Grayson was not "so obvious, [nor] the [alleged] inadequacy [of the training] so likely to result in the violation of constitutional rights, that the [Town] can reasonably be said to have been deliberately indifferent to the need [for training]." *City of Canton,* 489 U.S. at 390, 109 S.Ct. at 1205.

It bears reminding that the gravamen of the amended complaint is not that Grayson did not adequately investigate these allegations, but that he purposely chose not to investigate them at all. It is reasonable to observe, therefore, that whatever *relevant* training the Town failed to give Grayson would not have entailed specialized law-enforcement investigatory skills, but simply the commonplace understanding that police officers may not deny law-enforcement protection based simply on their arbitrary classifications of various groups of crime victims.

Thus, the amended complaint asserted no sufficient basis for concluding that Town policymakers reasonably should have anticipated that a new police chief would need specialized instruction in so rudimentary a law-enforcement responsibility, nor that the Town had been put on notice that such equal-protection violations were routine occurrences in domestic child sexual abuse cases, either locally or elsewhere. Rather, unlike many other law-enforcement responsibilities, *cf., e.g., id.* at 390 & n. 10, 109 S.Ct. at 1205 & n. 10 (noting that it might be considered "obvious" that armed police officers assigned to arrest fleeing felons would need instruction regarding constitutional limitations on proper use of deadly force), the Equal Protection Clause bar against arbitrary law enforcement is neither obscure nor problematic of application.[14]

Finally, plaintiffs have not alleged that the Town was ever placed on notice that Grayson, *after* he was appointed in 1975, routinely violated the equal protection rights of citizens by engaging in selective and arbitrary law enforcement. *See Swain v. Spinney,* 117 F.3d 1, 11 (1st Cir.1997) (lack of notice of prior constitutional violations defeats failure-to-train claim). Accordingly, we conclude that the proposed amendment to the complaint would have been futile.[15]

Needless to say, our conclusion represents no endorsement of the conduct with which Grayson is charged in the complaint. It would be dereliction of duty for a police chief to turn over to private parties the decision whether a serious offense should be pursued and it is hard to imagine what might justify telling a complainant falsely that the prosecutor would have no interest in the complaint. Nevertheless, not every form of misconduct is a constitutional violation—most wrongs find their remedy under state law—and our present holding is simply that the allegations made in the complaint do not properly assert a violation of the Equal Protection Clause.

*Affirmed.*

**14.** *City of Canton* requires not only deliberate indifference but that the alleged failure to train be shown to have been the "closely related" cause of the constitutional injury. *Id.* at 390–91, 109 S.Ct. at 1205–06. As Grayson was a policymaking official, with discretion in law enforcement matters, plaintiffs were required to prove that he acted with *"purposeful* discrimination." Yet there has been no showing that whatever training was not provided to Grayson could have thwarted any such purposeful discrimination. Whereas law enforcement training might inform an officer about the proper methods to be used in mediating and diffusing crimes of domestic violence, for example, it does not necessarily follow that an officer *intent* on discriminating against a particular class of crime victims would be deterred from doing so by "enlightenment" training, especially given the contraindications implicit in plaintiffs' other evidence that the challenged decisionmaking by Grayson resulted from alcohol abuse, lassitude, or personal animosity toward individuals. *See Angel v. City of Fairfield,* 793 F.2d 737, 739 (5th Cir.1986) ("Here, Angel has failed to allege how the failure to train resulted in the denial of his right to equal protection of the laws.").

**15.** As no "federal question" claims remain, we also affirm the district court's discretionary decision not to exercise its supplemental jurisdiction over plaintiffs' state-law claims for negligence and intentional infliction of emotional distress against the Town and Grayson. *See* 28 U.S.C. § 1367(c)(3).